Slip Op. 14 – 48

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| BP OIL SUPPLY COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | Before: Mark A. Barnett, Judge |
|  | : | Court No. 04-00321 |
| UNITED STATES, | : | |
| Defendant. | : | |

OPINION

[BP has failed to produce evidence to support its claim that Customs erred in denying its protests following Customs' rejection of its substitution unused merchandise drawback claim. The court will enter judgment for the United States.]

Dated: April 29, 2014

*John J. Galvin* and *Jack D. Mlawski*, Galvin & Mlawski, for Plaintiff.

*Marcella Powell* and *Beverly A. Farrell*, International Trade Field Office, U.S. Department of Justice, of New York, NY, for Defendant.

      Barnett, Judge:  Plaintiff BP Oil Supply Company brings suit to challenge United States Bureau of Customs and Border Protection's ("Customs") denial of Protest Nos. 5301-03-100333 and 5301-04-100162.  In the protests, Plaintiff contested Customs' refusal to approve twenty-seven claims for substitution unused merchandise drawback on 41,980,559 barrels of crude petroleum pursuant to 19 U.S.C. § 1313(j)(2).  The court held a trial on this matter on March 12, 2014.  During trial, Plaintiff entered one exhibit into evidence and presented the testimony of Mr. Bobby Waid.  Defendant United States offered no evidence, resting its case

after Plaintiff presented its case-in-chief.[1] The parties completed post-trial briefing on March 20, 2014. Based on the findings of fact and conclusions of law below, pursuant to USCIT Rules 52(a) and 58, the court finds that Plaintiff did not produce evidence demonstrating that the imports in question (except for the three types conceded by Defendant) are commercially interchangeable with the substitute merchandise. Plaintiff also did not produce evidence demonstrating that the substitute merchandise is not used. The court will enter judgment for Defendant.

## BACKGROUND

Between 1994 and 1996, Plaintiff imported a total of 41,980,559 barrels of crude petroleum oil of various types: "Cabinda" crude petroleum from Angola; "Zaire" crude petroleum from what is now the Democratic Republic of Congo; "Rabi" crude petroleum from Gabon; "Forcados," "Bonny Medium," "Bonny Light," and "Qua Iboe" crude petroleums from Nigeria; "Camo Limon" crude petroleum from Columbia; and "Guafitas," "Mesa," and "Mesa 30" crude petroleums from Venezuela (the "imported merchandise"). Customs liquidated the entries in question under the *eo nomine* provision for "Petroleum oils, crude, Testing 25 degrees API[2] or more" in subheading 2709.00.20, HTSUS. (Compl. ¶¶ 5, 13; Ans. ¶¶ 5, 13; Uncontested Facts ¶¶ 18,[3] 20; Admin. R.[4]) During the following two years, Plaintiff exported identical quantities of

---

[1] After Plaintiff rested its case, Defendant moved for a directed verdict, which the court denied. (Trial Tr. 1:55:40-:50, Mar. 12, 2014.)
[2] API gravity is discussed further below.
[3] The parties had assigned non-sequential, sometimes repeating numbers to each paragraph of uncontested facts in Schedule C of the Pre-Trial Order. For ease of reference and to minimize risk of confusion, the court has assigned consecutive numbers to each paragraph found therein. (*See* ECF No. 156 at 8-10.)
[4] The Administrative Record refers to the record transmitted to the Court by Customs pursuant to 28 U.S.C. § 2635(a) and USCIT Rule 73.1. The Court's treatment of this record is discussed further below.

Alaskan North Slope ("ANS") crude petroleum (the "substitute merchandise"). (Compl. ¶ 6; Ans. ¶ 6; Admin R.) In 1998 and 1999, Plaintiff filed twenty-seven substitution unused merchandise drawback requests with Customs pursuant to 19 U.S.C. § 1313(j)(2), seeking drawback on the duties, environmental taxes, and merchandise processing fees[5] that it had paid on the imported merchandise. (*See generally* Compl.; Pl.'s Ex. 1.) Customs denied drawback on each entry, citing Plaintiff's failure to establish that the substitute merchandise was commercially interchangeable with the imported merchandise. (*See* Compl. ¶¶ 1-2; Ans. ¶ 1; Summons, ECF No. 1.) On June 24, 2003 and April 8, 2004, respectively, Plaintiff filed Protests 5301-03-100333 and 5301-04-100162 to challenge these decisions. (*See* Compl. ¶¶ 1-2; Ans. ¶ 1; Summons.) Customs denied the protests on January 28 and May 10, 2004, respectively. (*See* Compl. ¶¶ 1-2; Ans. ¶ 1; Summons.) Plaintiff appealed to this Court on July 19, 2004. (*See* Summons.)

In November 2010, Plaintiff moved for summary judgment, (ECF No. 51), and Defendant cross-moved for summary judgment in March 2011, (ECF No. 62). On September 16, 2011, the court denied both motions. *BP Oil Supply Co. v. United States*, Slip Op. 11-116, 2011 WL 4343853 (CIT Sept. 16, 2011). In its motion, Plaintiff argued that API gravity category alone sufficed as a matter of law to demonstrate commercial interchangeability between different crude oil types. The court found that Plaintiff presented no "would be admissible" evidence to demonstrate that API classification alone is indisputably sufficient for commercial interchangeability.[6] *Id.* at *4. Similarly, the court found that Plaintiff had not addressed, *inter*

---

[5] Plaintiff subsequently abandoned its claim for merchandise processing fee drawback. (Pl.'s Resp. to Def.'s 4th Mot. *in Limine*, ECF No. 149.)

[6] The court notes that at the summary judgment stage, BP relied on a number of exhibits containing evidence that "would be admissible" at trial (USCIT Rule 56(c)(1)); however, at trial,

*alia*, "the significance of the apparently undisputed fact that ANS cannot satisfy the New York Mercantile Exchange . . . light sweet crude contract (unlike Bonny Light and Qua Iboe crude), or the fact that ANS apparently cannot be commingled with sweet crude at the Strategic Petroleum Reserve." *Id.* at *3. The court also underscored that some of Plaintiff's drawback documents contained apparent discrepancies and that the meaning of others was simply unclear.[7] *Id.* at *3 n.5, 6. The court concluded that ferreting through these issues would require findings of fact at trial. *Id.* In denying the parties' motions, the court confirmed that Plaintiff would have to demonstrate at trial that the imported and substitute merchandise were commercially interchangeable and that the substitute merchandise was not used and in Plaintiff's possession prior to export. *See id.* at *4, 6.

## STANDARD OF REVIEW

Customs decisions enjoy a presumption of correctness, and the burden of proving otherwise lies with the challenging party. 28 U.S.C. § 2639(a); *accord Pillsbury Co. v. United States*, 27 CIT 1628, 1631, 293 F. Supp. 2d 1351, 1354 (2003). "The presumption is a procedural device that allocates the burden of producing evidence . . . . , placing the burden on [the plaintiff] to show that there was insufficient evidence for the factual components of [Customs'] decision." *Chrysler Corp. v. United States*, 592 F.3d 1330, 1337 (Fed. Cir. 2010) (citations omitted). The presumption attaches only to the factual bases of Customs' decisions; the Court reviews the legal aspects of challenged decisions *de novo*. *Pillsbury Co.*, 27 CIT at 1631, 293 F. Supp. 2d at 1354 (citing *Universal Elecs., Inc. v. United States*, 112 F.3d 488, 492 (Fed. Cir. 1997)).

---

BP did not seek to introduce into evidence any exhibits other than excerpts from its drawback claims.

[7] At trial, Plaintiff did not address these questions identified by the court in 2011.

## LEGAL FRAMEWORK

Drawback is a "refund or remission, in whole or in part, of a customs duty, fee or internal revenue tax which was imposed on imported merchandise under Federal law because of its importation." 19 C.F.R. § 191.2(i). Drawback is a statutory privilege – not a right – and it is due "*only* when enumerated conditions are met." *Guess?, Inc. v. United States*, 944 F.2d 855, 858 (Fed. Cir. 1991) (emphasis added). "Because the drawback statute is a grant of privilege, the construction most advantageous to the interests of the government must be adopted." *Hartog Foods Int'l, Inc. v. United States*, 291 F.3d 789, 793 (Fed. Cir. 2002) (describing *Swan & Finch Co. v. United States*, 190 U.S. 143, 146-47 (1903)).

Substitution unused merchandise drawback allows a party to recoup from Customs ninety-nine percent of any duty, tax, or fee imposed on imported merchandise if the party establishes that:

> (1) the substitute merchandise (for export) is commercially interchangeable with the imported merchandise, (2) the substitute merchandise is either exported or destroyed under supervision, and (3) before such exportation or destruction (i) the substitute merchandise was not used within the United States and (ii) was in the possession of the party claiming drawback.

*BP Oil Supply Co.*, 2011 WL 4343853, at *1 (citing 19 U.S.C. § 1313(j)(2)).

Whether merchandise is "commercially interchangeable" is "an objective, market based consideration of the primary purpose of the goods in question." *Pillsbury Co.*, 27 CIT at 1632, 293 F. Supp. 2d at 1355 (quoting *Texport Oil Co. v. United States*, 185 F.3d 1291, 1295 (Fed. Cir. 1999)). The court must objectively determine "from the perspective of a hypothetical reasonable competitor" if a reasonable competitor would accept either the imported merchandise or substitute merchandise "for its primary commercial purpose." *Id.* (quoting *Texport Oil Co.*,

185 F.3d at 1295). If the competition would accept either, the merchandise is commercially interchangeable. *Id.* In performing this analysis, the court may look to, *inter alia*, governmental and recognized industrial standards, part numbers, tariff classifications, and the relative values of the merchandise. *Texport Oil Co.*, 185 F.3d at 1295; S. Rep. No. 103-189, at 83 (1993); H.R. Rep. No. 103-361, at 131 (1993); 19 C.F.R. § 191.32(c). It may also examine negotiations between commercial actors, the description of the goods on bills of sale or invoices, as well as other relevant factual evidence. *Texport Oil Co.*, 185 F.3d at 1295; *Pillsbury Co.*, 27 CIT at 1633, 293 F. Supp. 2d at 1355-56.

## THE EVIDENCE BEFORE THE COURT

As noted above, at trial, Plaintiff introduced only one of the exhibits identified in the Pre-Trial Order, (ECF No. 156), and only one of the two identified witnesses. The exhibit introduced by Plaintiff was comprised of excerpts from duty drawback claims made by Plaintiff and denied by Customs. In some cases, the excerpts did not include the signature page of the drawback claim, in other cases it was clear that the claim had been amended but the amendments were not included in the exhibit, and, in all cases, the Customs entry form (Form 7501) identifying the specific type of oil entered was not included. These additional pages and forms were, however, contained in the administrative record, transmitted to the Court by Customs pursuant to 28 U.S.C. § 2635(a) and USCIT Rule 73.1. Neither Plaintiff nor the Defendant moved the administrative record into evidence and, with the exception of the excerpts contained in Plaintiff's Exhibit 1, the truth of the assertions contained in the documents comprising the administrative record was not tested at trial.

Section 2635(a) of 28 U.S.C. and USCIT Rule 73.1 require Customs to provide the documents comprising the record of the Customs protest to the Court "as part of the official

record." At the same time, 28 U.S.C. § 2640(a)(1) provides that the Court "shall make its determinations upon the basis of the record made before the court" in cases contesting the denial of a protest. Consequently, in prior cases, the Court has found that it "must make its determination on the basis of the record before it, comprising the evidence introduced at trial, rather than that developed by Customs." *Am. Sporting Goods v. United States*, 27 CIT 450, 457 n.17, 259 F. Supp. 2d 1302, 1308 n.17 (2003) (citations omitted); *accord Sol Kahaner & Bro. v. United States*, 65 Cust. Ct. 512, 517-18 (1970); *Steelmasters, Inc. v. United States*, 31 Cust. Ct. 234, 235 (1953). *But see M. Pressner & Co. v. United States*, 26 C.C.P.A. 186, 193 (1938); *N.Y. Merch. Co. v. United States*, 44 Cust. Ct. 144, 148 (1960).

Prior Court decisions on whether the administrative record transmitted to the Court by Customs and made part of the official record must also be considered to have been admitted into evidence are not entirely clear. Many Customs cases have found that the administrative record "may not be considered by the court as establishing the truth of the recitals or statements contained therein" during trial if it has not been moved into evidence. *Alltransp. Inc. v. United States*, 60 Cust. Ct. 55, 58, 278 F. Supp. 746, 749 (1968) (citation omitted); *accord Sol Kahaner & Bro.*, 65 Cust. Ct. at 517-18; *Swift & Co. v. United States*, 33 Cust. Ct. 212, 217 (1954); *Steelmasters, Inc.*, 31 Cust. Ct. at 235; *see also S. S. Kresge Co. v. United States*, 340 F. Supp. 1404, 1406 (Cust. Ct. 1972). Conversely, other cases have held that parties in a Customs protest case do not need to move administrative record documents into evidence during trial, because "having been transmitted to the court with the protest, [they] w[ere] already a part of the record before the court." *N.Y. Merch. Co.*, 44 Cust. Ct. at 148; *accord M. Pressner & Co.*, 26 C.C.P.A. at 193.

In this case, the Court acknowledges the contents of the administrative record and admits those documents into evidence for the purpose of establishing the claims made by Plaintiff for duty drawback. However, because neither party moved the documents into evidence, and the truth of the contents of those documents was not tested at trial, the court does not take the documents as demonstrative of the truth of the matters asserted within them. *See Alltransp. Inc.*, 60 Cust. Ct. at 58, 278 F. Supp. at 749; 2 Law & Practice of U.S. Regs. of Int'l Trade § 23:316 (2014).

To the extent that Plaintiff has suggested that the Court should take judicial notice of the contents of the administrative record, judicial notice of an adjudicative fact is appropriate when the fact in question is not subject to reasonable dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Here, the administrative record supports Plaintiff's claims to the extent that it documents Plaintiff's request for duty drawback with regard to certain identified entries of crude petroleum and exports of ANS crude oil. In the absence of any supporting testimony, as discussed below, the Court declines to give the documents comprising the administrative record any further weight with regard to the issues in litigation: the commercial interchangeability of the various types of imported merchandise; Plaintiff's possession of the exported substitute merchandise; and the non-use thereof.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Findings of Fact

**A. Undisputed Facts**

1. Between 1994 and 1996, Plaintiff imported a total of 41,980,559 barrels of crude petroleum oil of various types: "Cabinda" crude petroleum from Angola; "Zaire" crude

petroleum from what is now the Democratic Republic of Congo; "Rabi" crude petroleum from Gabon; "Forcados," "Bonny Medium," "Bonny Light," and "Qua Iboe" crude petroleums from Nigeria; "Camo Limon" crude petroleum from Columbia; and "Guafitas," "Mesa," and "Mesa 30" crude petroleums from Venezuela (collectively, the "imported merchandise"). (Compl. ¶ 5; Ans. ¶ 13; Uncontested Facts ¶ 18; Admin. R.)

2. Customs liquidated the entries in question under the *eo nomine* provision for "Petroleum oils, crude, Testing 25 degrees API or more" in subheading 2709.00.20, HTSUS. (Compl. ¶ 5; Ans. ¶ 13; Uncontested Facts ¶ 18; Admin. R.)

3. Between 1997 and 1999, Plaintiff exported identical quantities of ANS crude petroleum. (Compl. ¶ 6; Ans. ¶ 6; Admin. R.)

4. In 1998 and 1999, Plaintiff filed twenty-seven substitution unused merchandise drawback requests with Customs pursuant to 19 U.S.C. § 1313(j)(2), seeking drawback on the duties, environmental taxes, and merchandise processing fees that it had paid on the imported merchandise. (*See generally* Compl.; Pl.'s Ex. 1.) The drawback requests related to the following entry numbers:  AA6-0303681-2, AA6-0303685-3, AA6-0303770-3, AA6-0303771-1, AA6-0303772-9, AA6-0303773-7, AA6-0303906-3, AA6-0303907-1, AA6-0303908-9, AA6-0303910-5, AA6-0304335-4, AA6-0304336-2, AA6-0304382-6, AA6-0304401-4, AA6-0304559-9, AA6-0304560-7AA6-0304561-5, AA6-0304572-2, AA6-0304573-0, AA6-0304574-8, AA6-0304620-9, AA6-0304728-0, AA6-0304728-0, AA6-0304967-4, AA6-0307197-5, AA6-0307211-4, AA6-0303909-7, and AA6-0304548-2. (Pl.'s Ex. 1.)

5. Customs denied drawback on every entry, citing Plaintiff's failure to establish that ANS crude oil was commercially interchangeable with the imported merchandise. (*See* Compl. ¶¶ 1-2; Ans. ¶ 1; Summons.)

6. Plaintiff challenged these decisions and filed Protests 5301-03-100333 and 5301-04-100162 on June 24, 2003 and April 8, 2004, respectively. (*See* Compl. ¶¶ 1-2; Ans. ¶ 1; Summons.) Customs denied the protests on January 28 and May 5, 2004, respectively. (*See* Compl. ¶¶ 1-2; Ans. ¶ 1; Summons.)

7. Plaintiff appealed Customs' denial of its protests to this Court on July 19, 2004. (*See* Summons.)

8. Plaintiff argues that Customs erred in its decisions for the following reasons: (1) the substitute merchandise was commercially interchangeable with the imported merchandise because both were API gravity Class III crude oils; (2) the substitute merchandise was in Plaintiff's possession prior to export; and (3) the substitute merchandise was not used prior to export. (Pl.'s Pretrial Summ. Mem. 1, ECF No. 157.)

9. Crude Oils are classified by their density and sulfur content. Less dense (or "lighter") crudes generally have a higher share of light hydrocarbons – higher value products – that can be recovered with simple distillation. Denser (or "heavier") crude oils produce a greater share of lower-valued products with simple distillation and require additional processing to produce the desired range of products. Some crude oils also have higher sulfur content, an undesirable characteristic with respect to processing and product quality. (Uncontested Facts ¶ 21.)

10. In addition to density and sulfur content, other characteristics – for example, the presence of heavy metals and the crude oil's molecular structure – may affect a crude oil's processing costs and suitability for specific uses. (Uncontested Facts ¶ 21.)

11. "API gravity" expresses the gravity or density of liquid petroleum products. Crude Oil is customarily divided into four classes based upon API gravity. (Uncontested Facts ¶ 2.)

12. Class III crude petroleum has an API gravity between 25.0 and 44.9. (Compl. ¶ 8; Ans. ¶ 8; Uncontested Facts ¶ 19.)

13. The imported merchandise and substitute merchandise fell into the Class III category based on API gravity. (Uncontested Facts ¶ 18; Compl. ¶¶ 5-6; Ans. ¶¶ 5-6.)

14. In commercial transactions, parties refer to crude oils by name, with the understanding that different crude oils have different characteristics. (Uncontested Facts ¶¶ 12, 14.)

15. Refineries in the United States rarely run on a single crude oil type. (Uncontested Facts ¶ 23.) Many choose a mix of crude oils to maximize production of desirable products in accordance with the refinery's limitations. (Uncontested Facts ¶ 23.) Some refineries cannot run ANS crude oil. (Uncontested Facts ¶ 13.)

16. Defendant conceded, based only upon information supplied by its own experts, that Plaintiff's imports of "Cano Limon," "Mesa," and "Mesa 30" crude petroleums are commercially interchangeable with the substitute merchandise. *BP Oil Supply Co.*, 2011 WL 4343853, at *3 (citing Def.'s Mot. to Dismiss & Cross Mot. for Summ. J. 2 n.1).

17. The Trans Alaskan Pipeline System ("TAPS") transports crude oil produced in Alaska's North Slope to Valdez, Alaska. (Uncontested Facts ¶¶ 3, 9.)

18. BP Exploration (Alaska) extracted the ANS crude oil in question, delivered it to pump station 1 of TAPS, at which point possession of the crude oil transferred to BP Pipelines. (Uncontested Facts ¶ 3.)

19. One crude oil stream from the North Slope can have a remarkably higher quality than another stream. (Uncontested Facts ¶ 10; *accord* Trial Tr. 1:37:20-:52, Mar. 12, 2014.)

20. "Crude oil producers . . . have 'a system called a quality bank[,]' which is 'a way to commingle crude streams[,]' and 'the owners of the crude streams agree between themselves what . . . they're going to value the crude stream as.'" (Uncontested Facts ¶ 6 (citation and quotation marks omitted).) "The Quality Bank is a system to value different crude streams differently based on their specific gravity or their value." (Uncontested Facts ¶ 7 (citation and quotation marks omitted).) "The Quality Bank allows one operator's crude to be valued higher than other operator's [sic] crude." (Uncontested Facts ¶ 8 (citation and quotation marks omitted).)

21. The Quality Bank allows producers to take these physical quality differences and their corresponding differences in monetary value into account. (Uncontested Facts ¶ 8; *accord* Trial Tr. 43:50-44:06, 1:37:20-1:39:40.)

22. Crude oil is tested before entering TAPS and again at Valdez to determine the Quality Bank monetary adjustment that each producer receives for differences in the quality and value between their respective inputs and the commingled output of the pipeline. (Uncontested Facts ¶ 9; *accord* Trial Tr. 43:50-44:06, 1:37:20-1:39:40.)

23. Refineries along TAPS withdraw crude petroleum from the pipeline, process certain fractions of the oil, and return the residual back into TAPS. (Uncontested Facts ¶ 4.)

24. The residual returned to the pipeline is different than the crude petroleum withdrawn from the pipeline. (Uncontested Facts ¶ 5.)

25. A "bill of lading" is a commercially available document issued by a carrier to a shipper, furnishing written evidence regarding receipt of goods, the condition on which transportation of the goods is made, and the engagement to deliver the goods at a prescribed port of destination to the lawful holder of the bill of lading. (Undisputed Facts ¶ 17.)

### B. Findings of Fact Established at Trial

26. The substitute merchandise falls within subheading 2709.00.20, HTSUS. (*See* Admin. R.)

27. At trial, the court heard the testimony of Mr. Bobby Waid, a licensed customs broker specializing in duty drawback and Chief Executive Officer of Charter Brokerage, LLC, a licensed customhouse brokerage specializing in imports and exports of bulk commodities, principally petroleum, petroleum products, and other petroleum derivatives. (Trial Tr. 19:45-21:45.) Mr. Waid provided credible testimony about how the drawback documents at issue were completed and the operation of TAPS. He received no compensation for his testimony. (Trial Tr. 48:10-:15.)

28. Mr. Waid's office prepared and filed the drawback claims at bar, and he personally reviewed their preparation and submission. (Trial Tr. 26:00-:30, 29:00-:06, 48:25-:43.)

29. The drawback documents in Plaintiff's Exhibit 1 do not contain the price or values of the imported merchandise or substitute merchandise, their API gravity, sulfur content, distillation properties, or other comprehensive assay information. (Trial Tr. 53:09-:14,

53:38-:43, 53:45-54:33, 57:28-:59, 1:00:45-1:31:05, 1:32:20-1:33:25.)  However, API gravity, sulfur, sediment, and water content information from an inspection analysis were included in the drawback applications for all imported merchandise and substitute merchandise.  (Trial Tr. 1:48:33-1:50:26; *see* Admin. R.)  The crude oil prices are not listed in the Exhibit 1 documents, because Customs assesses duty on crude oil by the barrel, not at an *ad valorem* rate.  (Trial Tr. 1:45:40-1:46:11.)

30. The import designation sheets and export summary procedures for each drawback claim do not directly address commercial interchangeability.  (Trial Tr. 1:49:45-:52; *see* Pl.'s Ex. 1.)

31. BP Exploration (Alaska) performs a comprehensive assay at an oil field when the field comes online and, thereafter, every eighteen to twenty-four months.  (Trial Tr. 38:30-:55.)

32. Comprehensive assays reveal, among other factors, the distillation, gas chromatography, metal content, viscosity, API gravity, sediment, sulfur, and water content of the crude oil.  (Trial Tr. 39:10-40:30.)

33. Comprehensive assays are not performed on individual crude oil shipments; rather, shipments receive a simpler analysis, which reveals only the API gravity, sediment, sulfur and water content of the crude oil.  (Trial Tr. 40:10-:30, 1:48:33-1:50:26.)

34. Nothing in the record drawback documents reveals how much Plaintiff received or had to pay into the Quality Bank when the substitute merchandise was received after it came out of TAPS.  (Trial Tr. 1:39:45-:56; *see* Admin. R.)

35. The refineries along TAPS remove four to six percent of the pipeline's crude oil, run it through a distillation tower, take off a distillation cut of diesel and jet fuel, and then re-inject the residual materials back into TAPS. (Trial Tr. 35:00-37:55, 1:34:55-1:36:16.)

36. Plaintiff's drawback documents do not contain any document showing the ownership of the substitute merchandise being transferred to Plaintiff at Valdez. (Trial Tr. 47:55-48:08, 55:34-:50, 1:00:45-1:31:05; *see* Admin. R.)

37. Each drawback application at issue contains bills of lading documenting the exportation of ANS by Plaintiff, which is listed as the shipper, but not the exporter. (Trial Tr. 47:00-:06, 55:34-:50, 1:00:45-1:31:05; *see* Admin R.)

38. At Valdez, crude oil from TAPS is discharged from tanks into vessels, via a vessel's flange, for transport. (Trial Tr. 46:00-:17.)

39. If any of these Findings of Fact are more properly denominated Conclusions of Law, they shall be deemed to be so.

## II. Conclusions of Law

40. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a).

41. Plaintiff timely filed the protests at bar and commenced this action pursuant to 19 U.S.C. § 1514 and 28 U.S.C. § 2636(a), respectively.

42. Defendant has conceded that "Cano Limon," "Mesa," and "Mesa 30" crude oils are commercially interchangeable with the substitute merchandise; however, Plaintiff has not demonstrated that the remaining types of imported merchandise are commercially interchangeable with the substitute merchandise.

43. With regard to the commercial interchangeability criteria articulated in *Texport Oil*, there are no relevant differences between the imported merchandise and the substitute merchandise with regard to part numbers and tariff classifications.

44. With regard to government and recognized industrial standards, all of the types of imported merchandise are designated as Class III based on API gravity, an industry standard. Plaintiff has not established that there are any distinct, relevant government standards.

45. The record demonstrates that there are clear differences in recognized industrial standards between many of the types of imported merchandise and the substitute merchandise. The crude petroleums at issue are referred to by various names based on their geographic source and quality characteristics. Moreover, it appears from the evidence that even crude petroleum from the same field must be assayed to a limited degree on a semi-regular basis, suggesting that even crude petroleum from the same location varies in quality over time. Plaintiff presented no evidence that these differences are not commercially significant "from the perspective of a hypothetical reasonable competitor." *Texport Oil*, 185 F. 3d at 1295.

46. Differences between the crude petroleums in question, such as sediment, water, heavy metal content, and sulfur (sweet versus sour crudes), also affect a crude petroleum's processing costs and suitability for specific uses. Plaintiff has presented no evidence that these differences are not commercially significant "from the perspective of a hypothetical reasonable competitor." *Id.*

47. Plaintiff agrees that (1) domestic refineries often operate on a mixture of crude oils to maximize production of desirable products in light of a refinery's limitations and (2)

some refineries cannot process ANS crude oil. Plaintiff has not demonstrated that the imported merchandise and substitute merchandise would be accepted as substitutes for each other by refineries, with their various operating constraints, or any other hypothetical or actual commercial actor.

48. The sole example of market-based crude oil transactions between industry competitors that Plaintiff placed into evidence undermines its case. The Alaskan North Slope crude petroleum placed into TAPS is of remarkably differing qualities and values. Although it is all known by the same recognized industrial standard of "Alaskan North Slope," the inputs into the pipeline are so different that the various producers have established a Quality Bank to financially reconcile the differences in value between producers' inputs into TAPS and the pipeline's commingled output.

49. Thus, the evidence demonstrates that actual market competitors which have extracted crude petroleum known by the same industrial standard from the same region do not treat their crude petroleum as commercially interchangeable absent monetary adjustment. Consequently, the court finds that Plaintiff has not met its evidentiary burden to establish that reasonable competitors would accept ANS crude petroleum as commercially interchangeable with the imported merchandise, various crude petroleums extracted from regions across Western Africa and South America. *See Guess?, Inc.*, 944 F.2d at 858 (noting that exemption from duty is a statutory privilege due only when enumerated conditions are met).

50. Plaintiff also has failed to provide evidence demonstrating that the substitute merchandise qualified as "not used" prior to exportation.

51. When Alaskan North Slope crude petroleum passes through TAPS on its way to Valdez, refineries along the route remove between four and six percent of the oil, refine it in a distillation tower to extract a cut of diesel and jet fuel, and return the residual product into the pipeline.

52. This residual product is commingled in the TAPS stream and is present in all output from the pipeline. Thus, evidence indicates that a portion of the substitute merchandise has been used to manufacture diesel and jet fuel prior to the output from the pipeline being exported as substitute merchandise.

53. Plaintiff offers no evidence to support its position that the manufacturing of petroleum derivatives, with distinct names, characteristics, and uses, from a portion of the substitute merchandise does not constitute "use" of the substitute merchandise.

54. The court, therefore, finds that Plaintiff failed to meet its burden of demonstrating that the substitute merchandise was not used prior to export. *See id.*; *cf.* 19 U.S.C. § 1313(j)(3) (listing "operation[s] or combination[s] of operations . . . *not amounting to manufacture or production*," which do not qualify as "use" for substitution unused merchandise drawback purposes) (emphasis added); 19 C.F.R. § 191.2(q) (defining "manufacture and production" as "[a] process . . . by which merchandise is made into a new and different article having a distinctive 'name, character or use'"); 2 Albert H. Kritzer et al., International Contract Manual § 43:21 (2013) (stating that "simple processes that do not amount to manufacturing or production, such as testing, cleaning, repacking, and reworking, do not constitute 'use'").

55. Plaintiff has not demonstrated that (1) the imported merchandise (except for "Cano Limon," "Mesa," and "Mesa 30") and substitute merchandise are commercially

interchangeable, and that (2) the substitute merchandise was not used prior to exportation. For these reasons, Customs properly denied Plaintiff's request for drawback on its duties and environmental taxes.[8] *See* 19 U.S.C. § 1313(j)(2).

56. If any of these Conclusions of Law are more properly denominated Findings of Fact, they shall be deemed to be so.

### CONCLUSION

For the reasons stated above, the court finds that Plaintiff has failed to demonstrate that the imported merchandise, except for "Cano Limon," "Mesa," and "Mesa 30" crude oils, is commercially interchangeable with the substitute merchandise. Plaintiff also has failed to show that the substitute merchandise was not used prior to export. Consequently, none of Plaintiff's twenty-seven claims is eligible for substitution unused merchandise drawback under 19 U.S.C. § 1313(j)(2). The court will enter judgment for Defendant.

/s/   Mark A. Barnett
Mark A. Barnett
Judge

Dated: April 29, 2014
New York, New York

---

[8] Because Plaintiff's failure to show commercial interchangeability and non-use is dispositive, the court need not determine whether Plaintiff possessed the substitute merchandise prior to export.